IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

JACOB JOHNSON,

           Plaintiff,

    v.

RICHARD P. HARRON, et al.,

           Defendants.

Civil Action
No. 07-0023 (JBS)

**OPINION**

**APPEARANCES:**

Keith T. Smith, Esq.
Ridgewood Plaza
2327 New Road
Suite 202
Northfield, NJ 08234
    Counsel for Plaintiff Jacob Johnson

James B. Arsenault, Jr., Esq.
OFFICE OF COUNTY COUNSEL
4 Moore Road
DN-104
Cape May Court House, NJ 08210
       -and-
Judson B. Barrett, Esq.
BARRETT AND PAVLUK, LLC
Ocean Park Professional Bldg.
1602 Lawrence Avenue
Suite 109
Ocean, NJ 07712-2006
    Counsel for Defendants Richard P. Harron, John F. Callinan,
    and the County of Cape May

**SIMANDLE, District Judge:**

I.   **INTRODUCTION**

This matter is before the Court on a motion for summary judgement brought by Defendants Richard P. Harron, Warden of Cape May County Jail, John F. Callinan,[1] Sheriff of Cape May County, and Cape May County ("Defendants"), against Plaintiff Jacob Johnson ("Plaintiff") [Docket Item 31].  Plaintiff, formerly an inmate at Cape May County Jail ("Cape May"), seeks a remedy for the poor conditions he asserts he endured while in jail and Defendants' alleged refusal to permit him to file a grievance. Defendants' motion is unopposed.  As set out in detail below, the Court will grant summary judgment in favor of Defendants as to Plaintiff's federal claims under the Eighth Amendment and the Fourteenth Amendment, and decline to exercise supplemental jurisdiction over those state law claims presented in his complaint.

II.  **BACKGROUND**

A.   **Facts**

Plaintiff brought suit under 42 U.S.C. § 1983 and New Jersey common law based on the treatment he allegedly received while held at Cape May County Jail from August 12, 2006 through February 1, 2007.  (Pl. Dep. at 13.)  Specifically, he asserts

---

[1] Defendant Callinan's name is incorrectly spelled on the docket.

that Defendants forced him to live in conditions that violated
his rights under the Eighth Amendment, that Defendants prevented
him from filing grievances in violation of the Fourteenth
Amendment, and that Defendants were both negligent and reckless
in their treatment of Plaintiff and thus liable under tort law.
(Compl. at 2-6.)  Because this Court reviews the facts on a
motion for summary judgment, it will assumes Plaintiff's evidence
to be true and make all reasonable inferences in his favor.[2]

    Plaintiff, eighteen years old at the time, arrived at Cape
May on August 12, 2006 to serve a criminal sentence.  (Pl. Dep.
at 29; Defs. Ex. D.)  Officers placed Plaintiff in Dorm 6, a room
with twelve bunks that was holding about sixteen people when
Plaintiff arrived.  (Pl. Dep. at 29.)  He spent his first night
in jail lying on the concrete floor, along with several others,
with a sheet provided by Cape May officers.  (Id.)  He did not
sleep at all that night.  (Id.)  After twenty-four hours,
officers transferred Plaintiff to Dorm 12 where he slept on a
bunk for three days.  (Id. at 30.)

    Finally, officers brought Plaintiff to House 6, a pod with
twelve cells and originally designed for twelve people.  (Id.)
At the time Plaintiff arrived in House 6, there were twenty-four

_____

    [2] Though Plaintiff did not respond to Defendants' motion for
summary judgment, Defendants have submitted Plaintiff's
deposition along with their motion.  In that deposition Plaintiff
testified as to the factual basis for his claims for relief.

3

inmates held there.  (Id.)  Each cell had only one bunk, so half of the inmates had to sleep on the floor.  (Id.)  Jail personnel assigned Plaintiff to sleep on the floor of Cell D and he used the three-inch thick mattress given to him in Dorm 12.  (Id. at 31, 33, 54, 60.)  The unit had only three tables, with four chairs to each table, so that only half the population could eat at a table.  (Id. at 54.)  The inmates rotated who had to eat in their cells, and thus at some points during his incarceration Plaintiff was eating on his mattress on the floor of his cell. (Id.)

After about a month in Cell D, officers moved Plaintiff at his request to Cell J, because of a conflict with his cell-mate. (Id. at 32-33.)  The mattress came with him and again personnel assigned Plaintiff to the floor.  (Id. at 54.)  Jail personnel gave him a sheet, a little blanket, and one pillow with a pillowcase.  (Id. at 54-55.)  About once a week he received a clean sheet and pillowcase.  (Id. at 55.)  The mattress did not prevent Plaintiff from feeling the hard concrete beneath him and he was only able to sleep for about four hours a night.  (Id. at 41.)

The logistics of fitting two people in one cell at Cape May were as follows: Cell J was approximately eight feet long and five feet wide.  (Id. at 38.)  The bunk hung off the wall twelve inches above the ground.  (Id. at 39.)  If Plaintiff wanted to

4

sleep during the day, he had to crawl under the bunk and stay in one position, and then crawl out again.  (Id.)  Because of the close-quarters, one night around Thanksgiving Plaintiff's cell-mate climbed out of his bunk in the middle of the night and stepped on Plaintiff's right elbow, exacerbating an old injury and causing throbbing pain so that Plaintiff couldn't sleep for two days.  (Id. at 10, 14, 39.)  There was a toilet attached to the back wall of the cell, facing the door of the cell.  (Id. at 39-40.)  Plaintiff, afraid of having his head smashed between the gates of the cell when they were opened, preferred to sleep with his head towards the back wall.  (Id. at 40.)  Because of the size of the cell, Plaintiff was forced to sleep close to the toilet.  (Id. at 38.)  Approximately twelve times during his time at Cape May, Plaintiff was awoken in the middle of the night by his cell-mates urine, splashing on him while his cell-mate used the toilet.  (Id.)  After the first time Plaintiff was urinated on, he turned around and risked his head towards the door, but he could still feel the urine on his feet.  (Id. at 40, 44.)  Plaintiff's feet were basically touching the toilet.  (Id. at 44.)

Prisoners were responsible for cleaning the day area and the bathroom as well as their cells.  (Id. at 51-52.)  Every morning officers gave the inmates a mop and a bucket with a little bit of bleach to share amongst themselves and the inmates took turns

cleaning the day area.  (Id.)  Plaintiff asserts that, no matter
what they did, the jail was still filthy from built-up dirt,
mildew, and mold over the years.  (Id. at 53.)  While Plaintiff
was at the jail, inmates began getting cysts from the unsanitary
conditions, and so twice while Plaintiff was at Cape May he along
with all the inmates in his dorm were moved to another room for
the day, while jail personnel cleaned the dorm with bleach.  (Id.
at 28.)  Due to the outbreak of cysts, inmates were also provided
with cleaning products for their mattresses.  (Id. at 55.)
Plaintiff himself never developed sores from his mattress.  (Id.
at 29.)

On two occasions, jail personnel asked Plaintiff to
participate in a work program, to work off days of his sentence
and, with the first offer, was promised a bunk.  (Id. at 34-37.)
Plaintiff declined both offers because he had already been
granted parole for February 1st and could not earn any more days
off his sentence.  (Id. at 37.)  Plaintiff asserts that did not
believe that he would actually be given his own bunk and, in
fact, when his friend Johnny Perkins took the job, he did not get
a bunk and remained in the same unit as Plaintiff.  (Id. at 58.)

Plaintiff attempted to file a grievance six or seven times
to complain about sleeping on the floor and the unsanitary living
conditions.  (Id. at 21.)  Each time he asked an officer for a
grievance form or expressed his concerns, the officer would put

6

him off - saying there was nothing they could do or suggesting they would help later.  (Id. 21-22, 25-26.)  According to a handbook prison officials gave Plaintiff, there was meant to be a formal grievance procedure at Cape May, but none of the officers helped Plaintiff file his grievances.  (Id. at 20-22, 25-26.) In addition, at some point Plaintiff along with numerous other inmates spoke with a lieutenant and complained about being forced to sleep on the floor, but the lieutenant said there was nothing they could do about it.  (Id. at 46.)  However, Plaintiff never complained to any officer about being urinated on.  (Id. at 44-45.)

Plaintiff twice saw Defendant Harron walking around Cape May, but did not have a chance to speak to him about his concerns.  (Id. at 49.)  There is nothing in the record to suggest that Plaintiff had any contact with Defendant Callinan.

Plaintiff states that since he left Cape May, he has seen pictures of the facilities that show there are now two beds per cell.  (Id. at 46.)

### B.  Procedural History

On January 3, 2007, Plaintiff filed his first complaint in the matter, at that time appearing pro se [Docket Item 1]. Defendants filed an answer to that complaint on April 17, 2007 [Docket Item 12].  Plaintiff then obtained counsel and, on July 5, 2007, filed an amended complaint [Docket Item 19].  The

7

amended complaint asserts claims under the Eighth Amendment (Count I), the Fourteenth Amendment (Count II), as well as negligence (Count III), and recklessness (Count IV). Defendants in turn filed an answer to that amended complaint and on July 13, 2007 filed an amended answer [Docket Items 21 and 22]. On February 20, 2008, Defendants deposed Plaintiff on the basis of his complaints. Pursuant to Magistrate Judge Schneider's September 17, 2007 scheduling order, discovery is now complete [Docket Item 23]. Finally, on May 28, 2008, Defendants submitted the instant motion for summary judgment [Docket Item 31] with Plaintiff's deposition testimony attached. Plaintiff did not respond to that motion, nor did he contest Defendants' statement of material facts.

## III. SUBJECT MATTER JURISDICTION

Plaintiff asserts subject matter jurisdiction under 28 U.S.C. § 1331 for his claims raising federal questions. He does not argue that the Court has diversity jurisdiction over this matter and the Court finds that complete diversity is lacking. 28 U.S.C. § 1332(a)(1). The Court may exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), so long as Plaintiff's federal claims remain viable.

## IV. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment. Id.

In deciding whether there is a disputed issue of material fact, a court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255). The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted). The moving party

9

always bears the initial burden of showing that no genuine issue
of material fact exists, regardless of which party would have the
burden of persuasion at trial.  <u>Celotex Corp. v. Catrett</u>, 477
U.S. 317, 323 (1986); <u>Country Floors v. P'ship of Gepner and
Ford</u>, 930 F.2d 1056, 1061-63 (3d Cir. 1991).  "The burden on the
moving party may be discharged by 'showing' - that is, pointing
out to the district court - that there is an absence of evidence
to support the nonmoving party's case."  <u>Id.</u> at 325.

"[T]he nonmoving party may not, in the face of a showing of
a lack of a genuine issue, withstand summary judgment by resting
on mere allegations or denials in the pleadings; rather, that
party must set forth 'specific facts showing that there is a
genuine issue for trial,' else summary judgment, 'if
appropriate,' will be entered."  <u>U.S. v. Premises Known as 717 S.
Woodward Street, Allentown, Pa.</u>, 2 F.3d 529, 533 (3d Cir. 1993)
(quoting Fed. R. Civ. P. 56(e))(citations omitted).

> Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery
> and upon motion, against a party who fails to
> make a showing sufficient to establish the
> existence of an element essential to that
> party's case, and on which that party will
> bear the burden of proof at trial.  In such a
> situation, there can be "no genuine issue as
> to any material fact," since a complete
> failure of proof concerning an essential
> element of the nonmoving party's case
> necessarily renders all other facts
> immaterial.

<u>Celotex</u>, 477 U.S. at 323.

10

Here, though Plaintiff has not responded to Defendants'
motion, Defendants' have submitted Plaintiff's sworn testimony as
to the basis of his claims.  Plaintiff's failure to respond "is
not alone a sufficient basis for the entry of a summary
judgment."  See Anchorage Assocs. v. Virgin Islands Bd. of Tax
Review, 922 F.2d 168, 175 (3d Cir. 1990) (holding that a local
rule deeming unopposed motions to be conceded did not justify the
grant of summary judgment without analysis under Rule 56(e), Fed.
R. Civ. P.).  In order to grant Defendants' unopposed motion for
summary judgment, where, as here, "the moving party does not have
the burden of proof on the relevant issues, . . . the [Court]
must determine that the deficiencies in [Plaintiff's] evidence
designated in or in connection with the motion entitle the
[Defendants] to judgment as a matter of law."  Id.  The Court
will now turn its attention to that determination.

**B.   Municipal and Individual Liability**

Defendants maintain that Plaintiff's claims for relief under
Section 1983 must fail because Defendant County of Cape May, and
Defendants Harron and Callinan in their official capacities,[3]

_____

    [3] A Section 1983 action brought against a person in his
official capacity "generally represent[s] only another way of
pleading an action against an entity of which an officer is an
agent."  Monell v. New York City Dep't of Soc. Services, 436 U.S.
658, 690 n.55 (1978).  "[I]n an official-capacity action . . . a
governmental entity is liable under § 1983 only when the entity
itself is a 'moving force' behind the deprivation; thus, in an
official-capacity suit the entity's 'policy or custom' must have
played a part in the violation of federal law."  Kentucky v.

cannot be held liable under a theory of respondeat superior,
citing Monell v. New York City Dep't of Soc. Services, 436 U.S.
658, 690-91, 694 (1978).

    "[A] local government may not be sued under § 1983 for an
injury inflicted solely by its employees or agents.  Instead, it
is when execution of a government's policy or custom,[4] whether
made by its lawmakers or by those whose edicts or acts may fairly
be said to represent official policy, inflicts the injury that
the government as an entity is responsible under § 1983."
Monell, 436 U.S. at 694.  Municipal liability under 42 U.S.C. §
1983 for a constitutional violation "attaches where - and only
where - a deliberate choice to follow a course of action is made
from among various alternatives by the official or officials
responsible for establishing final policy with respect to the
subject matter in question."  Pembaur v. City of Cincinnati, 475
U.S. 469, 483 (1986) (plurality opinion).

    There  are  three  situations  where  acts  of  a

---

Graham, 473 U.S. 159, 166 (1985) (internal citations omitted).

[4]
        A policy is made when a decisionmaker possess[ing]
        final authority to establish municipal policy with
        respect to the action issues a final proclamation,
        policy or edict.  A custom is an act that has not
        been  formally  approved  by  an  appropriate
        decisionmaker, but that is so widespread as to have
        the force of law.

Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d
Cir. 2003) (internal citations and quotations omitted).

> government employee may be deemed to be the result
> of a policy or custom of the governmental entity
> for whom the employee works, thereby rendering the
> entity liable under § 1983.  The first is where
> "the appropriate officer or entity promulgates a
> generally applicable statement of policy and the
> subsequent act complained of is simply an
> implementation of that policy."  The second occurs
> where "no rule has been announced as policy but
> federal law has been violated by an act of the
> policymaker itself."  Finally, a policy or custom
> may also exist where "the policymaker has failed to
> act affirmatively at all, [though] the need to take
> some action to control the agents of the government
> 'is so obvious, and the inadequacy of existing
> practice so likely to result in the violation of
> constitutional rights, that the policymaker can
> reasonably be said to have been deliberately
> indifferent to the need.'"

Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003). "[I]n the context of municipal liability, the Court has defined deliberate indifference as 'a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'"  Kaucher v. County of Bucks, 455 F.3d 418, 427 n.4 (3d Cir. 2006) (quoting Bd. of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997)).

Furthermore, like a municipality, an individual defendant "in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of respondeat superior."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence."  Id. (internal citations omitted).

13

With these principles in mind, the Court will determine whether Plaintiff has brought suit against the proper parties.

    1. <u>Municipal and Individual Liability for Alleged Eighth Amendment Violations</u>

  In this case there is no evidence that Cape May County had an affirmative policy or custom of forcing inmates to sleep on mattresses on the floor next to the toilet.  Nonetheless, Plaintiff has presented evidence from which a reasonable fact-finder making all inferences in Plaintiff's favor could conclude that Cape May County disregarded the obvious practice of forcing inmates to sleep on the floor - the very practice Plaintiff alleges is unconstitutional. <u>See</u> <u>Natale</u>, 318 F.3d at 584. According to Plaintiff, Cape May was severely overcrowded.  (Pl. Dep. at 29- 30.)  His dorm had only twelve bunks and seating for twelve people, but it held twenty-four people.  (<u>Id.</u> at 30, 54.) When a lieutenant came to speak to the inmates, "numerous" people "complained about sleeping on the floor."  (<u>Id.</u> at 46.) Plaintiff twice saw Defendant Harron walking the halls of the jail.  (<u>Id.</u> at 49.)  Since leaving Cape May, Plaintiff asserts that he has seen pictures of the cells and there are now two beds per cell.  (<u>Id.</u>)  From this evidence, if taken as true, a reasonable jury could find that Cape May County knew about the obvious practice of forcing inmates to sleep on mattresses on the floor and remained deliberately indifferent to its consequences. Thus Cape May County is not immune from liability for the

14

practice of jail personnel requiring Plaintiff to sleep on the floor with a mattress.  Whether the practice itself amounts to a violation of constitutional rights will be discussed below (Part IV.C, infra).

Defendants Harron and Callinan are similarly proper defendants in their individual capacities for this practice, for a reasonable fact-finder could infer based on the above cited facts and their respective roles in managing the jail that Defendants Harron and Callinan both knew about the obvious practice of requiring half the inmate population to sleep on the floor with mattresses and acquiesced in its implementation.  See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997) ("Our cases have held that 'actual knowledge and acquiescence' suffices for supervisory liability because it can be equated with 'personal direction' and 'direct discrimination by the supervisor.'") (internal citations omitted), overruled on other grounds by Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006).

There is, however, nothing in the record to suggest that Defendants turned a blind eye to the risk that Plaintiff would be splashed with urine.  Plaintiff admits that he never told anyone about this alleged problem and never attempted to file a grievance about it.  (Pl. Dep. at 44.)  There is nothing to show that others suffered from these admittedly humiliating and

15

unpleasant incidents.  See Carswell v. Borough of Homestead, 381
F.3d 235, 244 (3d Cir. 2004) (noting that to show deliberate
indifference "typically requires proof of a pattern of underlying
constitutional violations.").  This problem was not known or
obvious.  See Kaucher, 455 F.3d at 427 n.4.  For this reason, the
Court cannot conclude that Defendants proceeded with deliberate
indifference as to the risk that Plaintiff would be splashed with
urine, or knew and acquiesced to the practice, and so cannot be
held liable as individuals or on behalf of the county for these
alleged occurrences.

      2.   Municipal Liability for Alleged Fourteenth
           Amendment Violations

     In contrast to the practice of requiring inmates to sleep on
the floor, there is no evidence before the Court from which a
reasonable fact-finder could hold Defendant Cape May County
liable for individual officers' alleged failure to facilitate a
grievance procedure.  There is nothing in the record to suggest
either a policy or custom barring inmates from filing grievances,
nor is their anything to indicate deliberate indifference to any
obvious problem with regard to the grievance procedure.  To the
contrary, Plaintiff was provided a handbook setting forth the
Cape May grievance procedure.  (Pl. Dep. at 20-21.)  He further
had an opportunity, along with other inmates, to express his
concerns to a lieutenant.  (Id. at 46.)  Plaintiff's due process
claim rests on his six or seven attempts at file a grievance with

several different officers, who put him off or told him there was nothing they could do.  (Id. at 21.)  Plaintiff admits that he never spoke to Defendant Harron about this or any other problem and there is no evidence that he ever had any contact with Defendant Callinan.  (Id. at 49.)  A reasonable fact-finder, therefore, could not conclude that these six or seven incidents created such an obvious practice of obstruction of the grievance process such that Defendant Cape May County was deliberately indifferent to an obvious problem.  See Kaucher, 455 F.3d at 427 n.4.  Nor could this fact-finder infer that Defendants Harron and Callinan knew and acquiesced to the alleged obstruction by jail personnel.  See Robinson, 120 F.3d at 1294.  As such, Defendants cannot be held liable, either individually or in their official capacities, for the difficulties Plaintiff had in filing a grievance.  The Court is thus obliged to grant Defendants summary judgment as to Plaintiff's claim under the Fourteenth Amendment.[5]

---

[5] The Court further notes that, had Plaintiff brought suit against the proper parties for alleged violation of his due process rights by "refus[ing] to allow Plaintiff to file any grievance, and refus[ing] to provide a grievance procedure for Plaintiff concerning conditions of confinement" he would be unlikely to succeed.  (Am. Compl. at 5.)  Numerous district courts in this circuit, as well as non-precedential Third Circuit opinions, have held that "there is no due process right to a prison grievance procedure."  Pressley v. Johnson, 268 F. App'x 181, 183 (3d Cir. 2008) (citing Massey v. Helman, 259 F.3d 641, 647 (7th Cir.2001)); Booth v. King, 346 F. Supp. 2d 751, 761 (E.D. Pa. 2004) ("Prisoners are not constitutionally entitled to a grievance procedure and the state creation of such a procedure does not create a liberty interest requiring procedural protections under the Fourteenth Amendment."); Wilson v. Horn,

C.    **Eighth Amendment Claim**

Even if Plaintiff has brought suit against proper parties for alleged Eighth Amendment violations, Defendants assert that the deprivations he has alleged do not rise to the level of a constitutional violation.  The Court is bound in this matter by the law of the Third Circuit and must conclude that Plaintiff's nearly six months sleeping on the floor with a mattress could not be found to constitute cruel and unusual punishment. Consequently, the Court will grant summary judgment to Defendants on Plaintiff's Eighth Amendment claim.

"The Eighth Amendment to the United States Constitution prohibits any punishment which violates civilized standards and concepts of humanity and decency." Young v. Quinlan, 960 F.2d 351, 364 (3d Cir. 1992), superseded on other grounds by 42 U.S.C. § 1997e(a).  A prisoner does not lose this protection despite a prison sentence, for "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Helling v. McKinney, 509 U.S. 25, 31 (1993).  In order to establish a claim under the Eighth Amendment based on conditions of confinement, the Supreme Court has set forth a two-part test with objective ("Was the deprivation sufficiently serious?") and subjective ("Did the

---

971 F. Supp. 943, 947 (E.D. Pa. 1997), aff'd, 142 F.3d 430 (3d Cir. 1998) (same).

officials act with a sufficiently culpable state of mind?")
components.  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The
objective element requires a prisoner to show that his living
conditions amounted to a "serious deprivation of basic human
needs."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  The
subjective element demands that the prisoner demonstrate "that
prison officials acted or failed to act with deliberate
indifference."  Ingalls v. Florio, 968 F. Supp. 193, 198 (D.N.J.
1997).

     With regards to the objective prong, "the Constitution does
not mandate comfortable prisons."  Rhodes, 452 U.S. at 347.  "To
the extent that such conditions are harsh, they are part of the
penalty that criminal offenders pay for their offenses against
society."  Id.  Conditions of confinement for convicted criminals
are unconstitutional only when they "deprive inmates of the
minimal civilized measure of life's necessities."  Id.  Whether
forcing an inmate to sleep on the floor on a mattress meets this
standard is the source of conflicting views amongst federal
courts.  Compare Lareau v. Manson, 651 F.2d 96, 107-08 (2d Cir.
1981) (finding the practice violates the Eighth Amendment), and
Thomas v. Baca, 514 F. Supp. 2d 1201, 1215-19 (C.D. Cal. 2007)
(same), with Sanders v. Kingston, 53 F. App'x 781, 782 (7th Cir.
2002) (holding the Eighth Amendment does not require "elevated
beds for prisoners"), and Mann v. Smith, 796 F.2d 79, 85 (5th

Cir. 1986) (same), and Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985) (same).  The Third Circuit has very recently addressed this practice, albeit in a difference context.[6] Hubbard v. Taylor, 538 F.3d 229 (3d Cir. 2008) ("Hubbard II").

In Hubbard, the Third Circuit held that requiring pretrial detainees to sleep on a mattress on the floor in a cell holding three inmates for three to seven months did not constitute punishment in violation of the Fourteenth Amendment.  538 F.3d at 234-35.  The court rejected Lareau's per se ban on the practice and instead considered it "as part of the 'totality of the circumstances within [the] institution.'"  Id. at 235 (quoting Hubbard v. Taylor, 399 F.3d 150, 160 (3d Cir. 2005) ("Hubbard I")[7]).  The court then concluded that although the plaintiffs "did spend a substantial amount of time on floor mattresses,"

---

[6] In several unpublished decisions, the district courts of this circuit have found that temporarily forcing inmates to sleep on the floor with a mattress is not, by itself, enough to run contrary to the protections of the Eighth Amendment.  Renn v. Taylor, No. 99-765-SLR, 2001 WL 657591 (D. Del. 2001); Dickinson v. Taylor, No. 98-695-GMS, 2000 WL 1728363 (D. Del. 2000); Jackson v. Brewington-Carr, No. 97-270-JJF, 1999 WL 27124 (D. Del. 1999); Randall v. City of Philadelphia, No. 86-6300, 1987 WL 14383 (E.D. Pa. 1987); Huttick v. Philadelphia Prison System, No. 86-3714, 1986 WL 10558 (E.D. Pa. 1986).

[7] Hubbard I is the predecessor to Hubbard II.  In Hubbard I the Third Circuit remanded plaintiffs' case to the district court to apply the correct standard for a conditions of confinement claim by a detainee under the Fourteenth Amendment.  399 F.3d at 166-67.  The district court subsequently ruled in defendants' favor and plaintiffs appealed, resulting in Hubbard II.  538 F.3d at 230.

they had access to large day rooms and the record did not
substantiate plaintiffs' claims that the use of floor mattresses
caused disease or led to the splashing of human waste on the
plaintiffs.  Id.  After noting the efforts made by the jail to
improve conditions, the court found "that Plaintiffs were not
subjected to genuine privations and hardship over an extended
period of time for purposes of their due process claim."  Id.

Though the case at bar implicates the Eighth Amendment and
not the Fourteenth Amendment, because a suit under the Eighth
Amendment requires proof of greater deprivation than under the
Fourteenth Amendment, the Court finds that Hubbard II compels the
conclusion that Plaintiff cannot establish a serious deprivation
of his most basic human needs.  See Hubbard I, 399 F.3d at 164-
65.  In Hubbard I, the Third Circuit made clear that pretrial
detainees are entitled to greater protection from poor conditions
of confinement under the Fourteenth Amendment than inmates
seeking relief under the Eighth Amendment.[8]  399 F.3d at 165
("'Pretrial detainees . . . are entitled to at least as much
protection as convicted prisoners, so the protections of the
Eighth Amendment would seem to establish a floor of sorts.'")

---

[8] In Bell v. Wolfish, the Supreme Court held that whether a
condition of confinement of pretrial detainees violated their
constitutional rights turns on whether the disability is imposed
for the purpose of punishment or whether it is but an incident of
some other legitimate government purpose.  441 U.S. 520, 535-39
(1979).

(internal citations omitted).

With this in mind, the Court can find nothing in Plaintiff's situation to suggest that he suffered a worse fate than the plaintiffs in Hubbard II.[9]  See 538 F.3d at 237-39.  Plaintiff slept on a mattress on the floor for almost six months, one month less than the outer limit for the plaintiffs in Hubbard II.  (Pl. Dep. at 54.)  Plaintiff rejected the work program that might have

_____

[9] Plaintiff's testimony that he was splashed with urine does not suffice to establish an Eighth Amendment violation in the absence of Defendants' knowledge, under the factual circumstances here presented.  The Court has already found that there can be no municipal individual liability for this condition, but the Court also concludes that there is absolutely nothing in the record to establish that either Defendant Harron or Defendant Callinan actually knew of this problem - as is required under the subjective prong of Eighth Amendment analysis.  See Beers-Capitol v. Whetzel, 256 F.3d 120, 131 (3d Cir. 2001).

The Court will not, therefore, decide whether Plaintiff's Eighth Amendment claim could survive summary judgment had he presented some evidence that jail officials knew he was being splashed with urine, and that it was pervasive and unavoidable. The record suggests that Plaintiff and his cell-mate may have been able to avoid this problem, perhaps with the cell-mate waking Plaintiff when he needed to use the bathroom in the night. See Helling, 509 U.S. at 32 (noting that the rationale for applying Eighth Amendment scrutiny to prison conditions lies in inmates inability to care for themselves; to the extent that a condition of confinement can be mitigated by some reasonable cooperative effort of the inmates themselves, the rationale for finding an Eighth Amendment violation grows weaker). Nevertheless, had Plaintiff presented evidence that being sprayed with urine was an unavoidable consequence of being forced to sleep on the floor with a mattress and that Defendants knew about this problem, but failed to do anything to address it, or (for example) in fact ordered him subjected to such conditions as punishment for misbehavior, he might have presented a colorable Eighth Amendment claim.  Such are not the facts here and so the Court will not hold Defendants liable for a condition they did not know about and had no opportunity to correct.

22

given him a bunk to sleep on.  (Id. at 34-37.)  Plaintiff shared

a cell with one other inmate, while plaintiffs in Hubbard II

shared space with two others.  (Id. at 30.)  Plaintiff had access

to a day room, and though the record does not reveal how large

the room was, even if it was significantly smaller than the day

rooms used by Hubbard II's plaintiffs, this difference does not

sufficiently raise the level of his deprivations to meet the

higher Eighth Amendment standard.  (Id. at 51-52.)  Nor does the

alleged injury to his right arm make the reasoning in Hubbard II

inapplicable.[10]  (Id. at 10.)  The Court must consequently find

---

[10] Writing in dissent, Judge Sloviter emphasized that the
Hubbard II plaintiffs claimed injuries due to their living
conditions, including a broken leg and an infected shin.  538
F.3d at 239.
     Plaintiff's complaint does not set forth an Eighth Amendment
claim based on denial of medical care for the alleged re-injury
to his right arm, but instead seems to suggest that this alleged
injury is support for his conditions of confinement claims.  (Am.
Compl. at 3.)  However, in his deposition testimony, Plaintiff
asserted that following the incident where his cell-mate stepped
on his arm, Plaintiff submitted a form requesting medical
attention and the nurse on duty did not respond.  (Pl. Dep. at
15-17.)  Specifically, when asked if the nurse ever called him in
for treatment, he responded: "No, not really.  The only time they
did call me in was when we first got in to get tuberculosis test
[sic]."  (Id. at 17.)  Defendants' uncontested statement of
facts, however, reveals that "two days into his prison term,
[when] plaintiff complained of right elbow pain as a result of a
previous fracture and repair[,] [h]is right arm was examined and
he was prescribed medication."  (Def. Statement of Facts ¶ 10.)
Regardless, Plaintiff's evidence, pointing to a single request
for medical attention for an elbow injury, does not come close to
establishing the subjective deliberate indifference of Defendants
Harron and Callinan, required for a denial of medical care under
the Eighth Amendment.  See Natale, 318 F.3d at 582 (finding
deliberate indifference requires proof that the official knew of
and disregarded an excessive risk to inmate's health or safety).

that Plaintiff has not shown that he was deprived of the minimal civilized measure of life's necessities, consistent with the Third Circuit's holding in Hubbard II, and therefore the Court will grant summary judgment to Defendants as to Plaintiff's Eighth Amendment claim.

### D.   Remaining State Law Claims

The Court having dismissed Plaintiff's federal law claims in Counts One and Two, there are no claims in this case over which this Court has original jurisdiction.  All of Plaintiff's remaining claims are based on New Jersey tort law and, as the Court has already found, there is not complete diversity among the parties.  Under 28 U.S.C. § 1367(c), "[t]he district courts may decline to exercise supplemental jurisdiction over a [state law] claim . . . if the district court has dismissed all claims over which it has original jurisdiction." § 1367(c).  As a general rule, absent exceptional circumstances, "pendant jurisdiction [over claims based on state law] should be declined where the federal claims are no longer viable."  Shaffer v. Albert Gallatin Area Sch. Dist., 730 F.2d 910, 912 (3d Cir. 1984); see also Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995) ("where the claim over which the district court has original jurisdiction is dismissed before trial, the

---

As a consequence, Defendants are also entitled to summary judgment on any such claim.

district court must decline to decide the pendent state claims
unless considerations of judicial economy, convenience, and
fairness to the parties provide an affirmative justification for
doing so").

The Court does not find any justification for deciding
Plaintiff's pendant state law claims in this case.  When
Plaintiff originally filed this action, there was no basis for
this Court's original jurisdiction over his manifestly state law
claims asserted against non-diverse parties.  (Am. Compl. at 5-
6.)  The Court having dismissed Plaintiff's federal claims,
interests of judicial economy and comity weigh in favor of having
Plaintiff's state law claims litigated, if at all, in New
Jersey's courts.  Pursuant to 28 U.S.C. § 1367(c), the Court thus
declines to exercise supplemental jurisdiction over Plaintiff's
state law claims and will dismiss those claims as to all parties
to this action.

## V.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment on Plaintiff's claims under the Eighth and Fourteenth Amendments.  The Court will further decline to exercise supplemental jurisdiction over Plaintiff's state law tort claims and will consequently dismiss those claims without prejudice to Plaintiff's right to re-file same in the Superior Court of New Jersey.  The accompanying Order will be entered.


**November 13, 2008**                          **s/ Jerome B. Simandle**
Date                                            JEROME B. SIMANDLE
                                                United States District Judge

26